# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# ASHEVILLE DIVISION
# 1:16-cv-315-FDW

| | |
|---|---|
| BILLY JOSEPH EDWARDS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| GRAHAM COUNTY JAIL, et al., ) | **ORDER** |
| ) | |
| Defendants. ) | |
| ) | |

**THIS MATTER** comes before the Court on a Motion for Summary Judgment by Defendants Kevin Crane, Kim Holloway, and Kenneth Hyde. (Doc. No. 25).

## I. BACKGROUND

### A. Procedural Background

Pro se Plaintiff Billy Edwards filed this action on September 21, 2016, pursuant to 42 U.S.C. § 1983, alleging claims of deliberate indifference to serious medical needs as to various Defendants based on an alleged delay in treatment after Plaintiff allegedly suffered a heart attack while a pre-trial detainee at the Graham County Detention Center ("the jail") in Robbinsville, North Carolina. (Doc. No. 1). On December 22, 2016, following its initial review of Plaintiff's Complaint pursuant to 28 U.S.C. § 1915(e) and § 1915A, the Court entered an Order, holding that Plaintiff's claims of deliberate indifference against Hyde, Crane, and Holloway were sufficient to survive the Court's initial review, but dismissing the remaining Defendants. (Doc. No. 7). On March 14, 2017, Hyde, Crane, and Holloway filed their Answer, denying liability and asserting several affirmative defenses. (Doc. No. 14). On March 23, 2017, the Court

1

entered a Pretrial Order and Case Management Plan, setting a discovery deadline of July 21, 2017, and a deadline for dispositive motions of August 21, 2017. (Doc. No. 15). The parties exchanged written discovery. On July 5, 2017, the Court entered an Order granting leave to Defendants to take Plaintiff's deposition, (Doc. No. 22), which was conducted on July 14, 2017.

The moving Defendants filed their pending summary judgment motion on August 21, 2017. Defendants' summary judgment materials include Exhibit 1, titled "Plaintiff's Release of Documents," and Plaintiff's deposition. See (Doc. Nos. 24-1; 26-1). On August 24, 2017, this Court entered an order in accordance with Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the motion for summary judgment and of the manner in which evidence could be submitted to the Court. (Doc. No. 28). Plaintiff has responded to the summary judgment motion by submitting his own sworn statement and an affidavit of prior Graham County jail inmate Terry Buchanan. See (Doc. Nos. 29, 29-1). This matter is therefore ripe for disposition.

### B. Factual Background

The evidence on summary judgment shows the following:

Plaintiff is a North Carolina inmate currently incarcerated at Avery-Mitchell Correctional Institution in Spruce Pine, North Carolina. (Doc. No. 24-1 at p. 15: Pl.'s Dep.). At the time of the events forming the basis of this action, Plaintiff was a pretrial detainee at the Graham County jail, and Defendants were each employed by the Graham County Sheriff's Office at the jail— Hyde was employed as a Corporal and Day Shift Supervisor; Crane was employed as a transport officer; and Holloway was employed as a detention officer.

On September 19, 2015,[1] Plaintiff requested medical attention due to complaints of chest pain, dizziness, and shortness of breath. (Doc. No. 24-1, Ex. 4). Graham County's jail does not have any medical staff, so inmates needing medical attention are transported to outside healthcare providers. (Doc. No. 24-1 at pp. 25, 48-49, 85). Jail employee Charlene West transported Plaintiff to an urgent care clinic and then to Murphy Medical Center. (Id. at pp. 78-79, 88). Upon evaluating Plaintiff, Murphy Medical Center transported him to Mission Hospital in Asheville, North Carolina, where he was medically evaluated and received treatment involving the placement of stents. (Id. at pp. 51-52, 107). Following treatment at Mission Hospital, Plaintiff was released from Graham County's custody on bond, but was subsequently arrested again for violations of that bond. (Id. at pp. 58-60, 62; Ex. 5). Plaintiff remained incarcerated until his trial in January 2016, when he was convicted and taken into the custody of the North Carolina Department of Public Safety. (Doc. No. 24-1 at p. 15).

Plaintiff alleges and testified that on the date in question, there was a period of delay from the time he first requested medical attention until he was ultimately transported by jail personnel for medical evaluation and treatment. (Doc. No. 1; Doc. No. 24-1 at pp. 54-55). Based on Plaintiff's own allegations and testimony, Plaintiff's contentions as to the precise length of this alleged delay are unclear,[2] and Defendants have not stipulated to Plaintiff's assertions as to the same. Defendants contend, in any event, that when the questions and inconsistencies within Plaintiff's allegations and testimony are resolved and viewed in the light

---

[1] The Complaint alleges the events at issue took place on September 22, 2015. Based on jail records produced by Defendants in discovery, however, Plaintiff acknowledges that this was probably an error and agrees that September 19, 2015, is the actual date in question. (Doc. No. 24-1 at pp. 35-36).
[2] See (Doc. No. 1 IV(1), IV(3), IV(4), IV(7); Doc. No. 24-1 at pp. 25, 32, 46, 48-49, 52, 55, 87).

3

most favorable to him, the delay was at most about 10½ hours—from 7:30 a.m. until 6:00 p.m.[3] See (Doc. No. 24-1 at pp. 54-55).

Plaintiff alleges that he first complained of chest pains, left arm pain, and breathing problems to Holloway at 7:30 a.m., although he does not expressly allege he requested medical attention at that time. (Doc. No. 1 ¶ IV(1)). Plaintiff alleges that Holloway checked his blood pressure, informed him it was "very high," and instructed him to go lay down on his bunk. (Id.). Around 8:00 a.m., Plaintiff told jail personnel that he was "hurting bad" and needed to go to the doctor. (Doc. No. 24-1 at p. 87). At or around this time, another inmate at the jail, Charles Goodson, fell and also requested medical attention. (Doc. No. 1 ¶ IV(3); Doc. No. 24-1 at pp. 25, 89-90). Both Plaintiff and Goodson filled out Medical Request Forms to be taken for medical treatment sometime between 11:30 a.m. and noon. (Doc. No. 24-1 at pp. 25, 45, 100; Ex. 4). Plaintiff understood that filling out this form "was the first step to me being . . . taken . . . to the doctor." (Id. at pp. 48-49). Plaintiff contends that Hyde informed Plaintiff that he and Goodson would be transported for medical treatment "around noon," but that around 1:00 p.m., the transport officer Crane told him he could not watch both Plaintiff and Goodson at the same time, and transported Goodson for treatment before him. (Doc. No. 1 ¶¶ IV(3) and (4)); Doc. No. 24-1 at pp. 91-92, 124).

Plaintiff testified that he told Hyde that he thought he was having a heart attack, although he did not specifically allege this in his Complaint, nor did he write it on his Medical Request Form. (Doc. No. 24-1 at pp. 92-93, 104, Ex. 4; Doc. No. 1). At no time did Plaintiff tell defendants to "call 911" for him. (Doc. No. 24-1 at p. 103). Plaintiff testified that he kept

---

[3] As discussed, infra, Defendants contend that, for purposes of summary judgment, any delay—even the varying periods of delay as put forth by Plaintiff—are immaterial to the basis on Defendants contend they are entitled to summary judgment.

asking whether anyone was going to take him every time the jail personnel made their rounds, and was eventually told that there was not anyone available to take him and that he would have to wait until Charlene West's son was finished playing a football game sometime after 5:00 p.m. (Id. at pp. 100-01). Around 6:00 p.m., Charlene West transported Plaintiff to an urgent care clinic. (Id. at p. 52). The urgent care clinic then referred him to Murphy Medical Center. (Id. at p. 106).

Plaintiff testified that medical testing performed at Murphy Medical Center indicated he had experienced "multiple heart attacks." (Id. at p. 107). Plaintiff was then transported from Murphy Medical Center to Mission Hospital. (Id.). He underwent testing at Mission the next morning, on September 20, 2015. (Id. at pp. 51-52). Plaintiff testified that cardiologist William Thomas Maddox evaluated him and diagnosed him as having had a heart attack. (Id. at pp. 50, 107). According to Plaintiff, Dr. Maddox advised him that "there was some bad stuff going on" and that he had "blockages." (Id. at pp. 52-53). Dr. Maddox recommended bypass surgery. (Id.). Plaintiff testified he was "scared to death" at the thought of heart surgery, and he asked Dr. Maddox whether there were any less serious treatment alternatives. (Id.). Dr. Maddox informed him about a stent procedure as an alternative to bypass surgery. (Id.). Plaintiff decided on the stent procedure instead of bypass surgery. (Id. at p. 53).

A doctor other than Dr. Maddox performed the stent procedure. (Id. at pp. 53-54). Plaintiff is unable to identify this doctor. (Id.). After the stent procedure, Dr. Maddox checked on Plaintiff. (Id. at p. 54). Dr. Maddox told him that the stents were not permanent, and that he would "have trouble out of them eventually." (Id. at p. 55). Plaintiff told Dr. Maddox he was thinking about filing a lawsuit over the alleged delay by the jail in getting him medical attention. (Id. at p. 54). According to Plaintiff, Dr. Maddox told him that "excessive delay has caused you

5

severe heart damage," and that if Plaintiff needed his help with anything to contact him. (Id. at p. 55). Dr. Maddox prescribed Plaintiff's medications following the stent procedure, but Plaintiff only takes aspirin now. (Id. at pp. 66-67). Plaintiff has not been seen by a cardiologist since being treated by Dr. Maddox in September 2015. (Id. at p. 58).

Plaintiff testified he has written Dr. Maddox at Asheville Cardiology three times since filing suit, asking whether he would testify on Plaintiff's behalf. (Id. at pp. 74-75). He has not received any response, and has not had any communications with Dr. Maddox since speaking with him in the hospital. (Id. at pp. 75-77). Plaintiff testified he has also requested his medical records from Mission Hospital, but he has not received any response. (Id. at pp. 77-78).

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his

6

pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 129 S.Ct. 2658, 2677 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

## III. DISCUSSION

### A. Plaintiff's Claim of Deliberate Indifference to Serious Medical Needs As to Defendants in their Individual and Official Capacities

As noted, Plaintiff alleges in this action that Hyde, Crane, and Holloway violated his constitutional rights by acting with deliberate indifference to his serious medical needs by ignoring his complaints about chest pain and delaying treatment for a heart attack. Claims under 42 U.S.C. § 1983 based on an alleged lack of or inappropriate medical treatment fall within the Eighth Amendment's prohibition against cruel and unusual punishment.[4] Estelle v. Gamble, 429

---

[4] Because Plaintiff was a pre-trial detainee at all relevant times, his deliberate indifference claim is properly brought under the Fourteenth Amendment, rather than the Eighth Amendment, but the analysis is the same. See City of Revere v. Mass. Gen. Hosp., 463 U.S. 239 (1983); but see Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473, 2475 (2015) (holding that the test for excessive force claims brought by pretrial detainees under the Fourteenth Amendment differs from the test for excessive force claims brought by convicted prisoners under the Eighth Amendment). This Court observes that even if the Fourth Circuit were to apply to pre-trial detainees' deliberate indifference claims the Kingsley v. Hendrickson "objective unreasonableness" standard that currently applies to pre-trial detainees' excessive force claims and apply that standard to deliberate indifference claims, Plaintiff has still not presented sufficient evidence to withstand

7

U.S. 97, 104 (1976). To state a claim under the Eighth Amendment, a plaintiff must show a "deliberate indifference to serious medical needs" of the inmate. Id. "Deliberate indifference requires a showing that the defendants actually knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care." Young v. City of Mt. Ranier, 238 F.3d 567, 575-76 (4th Cir. 2001) (citations omitted). "To establish that a health care provider's actions constitute deliberate indifference to a serious medical need, the treatment must be so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990).

Allegations that might be sufficient to support negligence and medical malpractice claims do not, without more, rise to the level of a cognizable Section 1983 claim. Estelle, 429 U.S. at 106; Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it."). To be found liable under the Eighth Amendment, a prison official must know of and consciously or intentionally disregard "an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S. 825, 837 (1994); Johnson v. Quinones, 145 F.3d 164, 167 (4th Cir. 1998). "[E]ven if a prison doctor is mistaken or negligent in his diagnosis or treatment, no constitutional issue is raised absent evidence of abuse, intentional mistreatment, or denial of medical attention." Stokes v. Hurdle, 393 F. Supp. 757, 762 (D. Md. 1975), aff'd, 535 F.2d 1250 (4th Cir. 1976). The constitutional right is to medical care. No right exists to the type or scope of care desired by the individual prisoner. Id. at 763. Therefore, a disagreement "between an inmate and a physician over the inmate's proper

---

Defendants' summary judgment motion.

medical care [does] not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985) (dismissing the plaintiff's § 1983 claim against a defendant physician for allegedly discharging the plaintiff too early from a medical clinic, as such claim did not rise to the level of deliberate indifference but would, "at most, constitute a claim of medical malpractice").

First, to the extent that Plaintiff has sued Defendants in their official capacities, a local government may be held liable under 42 U.S.C. § 1983 only if the plaintiff proves a "policy or custom" of the entity was a moving force behind a violation of constitutional rights. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 694 (1978). The Complaint does not allege, however, that Plaintiff's constitutional rights were violated pursuant to an unlawful policy or custom of the jail. Generally, the failure to allege a specific policy or custom is fatal to an official capacity claim against a government unit. See Alvarez v. Corr. Med. Servs., Inc., Civ. No. WDQ-10-179, 2015 WL 7012654, at *5 (D. Md. Nov. 12, 2015).

Next, to the extent that Plaintiff has sued the moving Defendants in their individual capacities, he has not raised a genuine dispute of fact as to his deliberate indifference claim to overcome Defendants' summary judgment motion.[5] The Court first finds that, contrary to Defendants' arguments, there is undisputed evidence on summary judgment showing that Plaintiff was suffering from a serious medical need on September 19, 2015. In the context of deliberate indifference claims, a medical need is serious if it is one that has been diagnosed by a physician as requiring treatment, or one that is so obvious even a lay person would easily

---

[5] Furthermore, to the extent that Plaintiff seeks injunctive and declaratory relief against Defendants, his claims are moot because he has been transferred away from the Graham County jail.

recognize the necessity for a doctor's attention. See Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). It is undisputed that, on September 20, 2015, a doctor at Mission Hospital performed surgery on Plaintiff to place stents in his heart. Thus, Plaintiff must have been suffering from a heart condition that was serious enough for a doctor to determine that stents should be placed in his heart. The Court agrees with Defendants, however, that Plaintiff has not produced any competent, medical evidence establishing that he suffered from heart attack, or a series of heart attacks, as he contends, while he was waiting to be treated. Most significantly, and fatal to his claim, is that Plaintiff has presented no objective medical evidence whatsoever to show that a delay in treatment resulted in damage to his heart that he would not have suffered but for the delay.

Here, Plaintiff alleges in his Complaint, and he testified in deposition, that on the day in question, he was diagnosed as having had a heart attack (or "a continuing heart attack," or "multiple heart attacks"). (Doc. No. 1 ¶ IV(7); Doc. No. 24-1 at pp. 50, 107). Plaintiff alleges and testified that there was a deliberate delay in transporting him for medical treatment, and that this delay caused "severe heart damage" he would not have suffered but for the delay. (Doc. No. 1 ¶ IV(8); Doc. No. 24-1 at pp. 54-55). Aside from the Complaint's allegations and his own deposition testimony, Plaintiff has submitted no supporting medical evidence, including any medical records, nor has he identified any medical expert witness to testify in support of his claim. Instead, these essential elements of his claim are based solely on alleged conversations with Dr. Maddox—inadmissible hearsay—and Plaintiff's own unqualified layman's opinion. Thus, there is no admissible evidence in the record of a doctor's diagnosis of a heart attack, or a serious of heart attacks, and this is not the type of medical condition that would be so obvious as to be recognized by a lay person.

10

Plaintiff did not produce any medical records in response to Defendants' request for them in discovery. (Doc. No. 24-1 at pp. 108-09; Ex. 7). His responses to Defendants' request for medical records merely states that "Mission Hospital has not yet complied to the court's orders to compel production."[6] (Id.). Plaintiff testified that he has requested medical records from Mission Hospital, but he has received no response. (Doc. No. 24-1 at pp. 77-78). Moreover, although he testified that Murphy Medical Center performed testing and informed him he had experienced multiple heart attacks, Plaintiff has not requested any records from it. (Id. at p. 107-08). Plaintiff also testified that he does not possess any of his medical records. (Id. at pp. 72-73).

Defendants also requested Plaintiff to identify any expert witness he intended to call at trial through written interrogatories. (Doc. No. 24-1, Ex. 7). Plaintiff responded, "See Affidavit of Evidence." (Id.). However, the "Affidavit of Evidence" to which Plaintiff's response refers discloses no expert witnesses at all, and instead merely restates Plaintiff's conclusory allegations as to how he contends his rights have been violated. (Id.). While Plaintiff's response does state that he "intends to subpoena and/or doctors and/or affidavits and jail inmates named below," no such individuals are named. (Id.). Moreover, in response to Defendants' request for documents relating to Plaintiff's expert witnesses, Plaintiff states "[t]he court has not ordered the expert jury and medical witnesses to be provided yet."[7] (Id.). Without medical records or expert testimony,

---

[6] Before Defendants' service of its written discovery requests on Plaintiff, Plaintiff served on defense counsel a document titled "Release of Documents 3rd Party Production F. R. Civ. P R. 26-37," directed to "Mission Hospital Records" and "Doctor William T. Maddox" which states, "Pursuant to the Rules of Federal Civil Practice your Petitioner Billy Edwards makes request for the production of medical records and any notes thereof, of the cardiac medical care on or about September 21st, 2015 and thereafter." (Doc. No. 26-1, Ex. 1). Presumably, this is the Court's "Order" to which Plaintiff's discovery response refers.

[7] As to any contention that plaintiff has somehow effectively disclosed Dr. William Maddox as a

the only potential evidence on which Plaintiff can rely in support of his claim is his own testimony. However, Plaintiff's testimony about his alleged heart attack is not competent evidence.

A nonexpert is not permitted to give expert testimony. See FED. R. EVID. 702. Rule 701(c) of the Federal Rules of Evidence only permits opinion testimony by lay witnesses when it is not based on "scientific, technical, or other specialized knowledge." FED. R. EVID. 701(c). The diagnosis of a myocardial infarction is an issue requiring such specialized knowledge, which Plaintiff lacks. (Doc. No. 24-1 at p. 10). Moreover, while Plaintiff's testimony about physical symptoms he experienced likely constitutes admissible evidence, his testimony purporting to diagnose or assume the existence of a heart attack does not. Such testimony is inadmissible lay opinion testimony. See FED. R. EVID. 701(c).

Last, Plaintiff's testimony about allegedly being told he had been diagnosed with having had a heart attack is inadmissible hearsay. See FED. R. EVID. 801(c), 802. Such statements were allegedly made by Dr. Maddox and other declarants not testifying at trial, and they are offered for the truth of the matter asserted in them. See FED. R. EVID. 801(c). In short, the sum total of Plaintiff's evidence as to whether he suffered from a heart attack or a serious of heart attacks consists solely of alleged statements made by Dr. Maddox and unnamed persons at Murphy Medical Center. (Doc. No. 24-1 at pp. 50, 107).

---

testifying expert, such conclusion is entirely inconsistent with Plaintiff's deposition testimony. Plaintiff testified he has written Dr. Maddox multiple times seeking confirmation that the doctor was willing to testify on his behalf in court, but has received no response. (Doc. No. 24-1 at pp. 72-79). Additionally, Plaintiff testified he would also want the doctor who performed the stent procedure to testify, but he does not know his identity. (Id. at p. 77). In any event, Plaintiff testified that Dr. Maddox is the only medical doctor who stated to him that the alleged delay in treatment caused him to suffer damage he would not have otherwise suffered. (Id. at p. 79).

Even if it were assumed that Plaintiff has successfully established that he suffered from a heart attack or a series of heart attacks, he has presented no competent evidence in the record showing the alleged delay in treatment for this condition resulted in any resultant harm or a worsened condition.[8] To survive summary judgment, an inmate asserting a deliberate indifference claim "must produce evidence of a serious or significant physical injury resulting from the challenged conditions." Strickler v. Waters, 989 F.2d 1375 (4th Cir. 1993). Intentionally delaying access to medical care may demonstrate deliberate indifference, but only if the delay results in some substantial harm. See Webb v. Hamidullah, 281 Fed. Appx. 129, 166 & n.13 (4th Cir. 2008) (citing Sealock v. Colorado, 218 F.3d 1205, 1210 (10th Cir. 2000)).

To demonstrate this resulting injury, a deliberate indifference inmate who contends "that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994). To withstand a motion for summary judgment, the non-moving party is required to forecast expert medical evidence in order to show proof of causation—that is, whether the alleged delay in treatment caused any injury. See Alberson v. Norris, 458 F.3d 762, 765-66 (8th Cir. 2006) ("Where the complaint [asserting a Section 1983 claim for inadequate medical treatment] involves treatment of a prison's sophisticated medical condition, expert testimony is required to show proof of causation."). Without expert testimony pertaining to causation, a layperson cannot

---

[8] The Court acknowledges that Plaintiff is pro se and also incarcerated, and his response is entitled to a less stringent standard than a response filed by a licensed attorney. Hall v. Bellmon, 935 F.2d 1106, 1110 (10th Cir. 1991). This does not, however, excuse Plaintiff from the burden of coming forward with evidence to support his claims as required by the Federal Rules of Civil Procedure and this Court's local rules. Furthermore, this Court may not assume the role of advocate for a pro se litigant. Hall, 935 F.2d at 1110.

determine the nature of Plaintiff's medical condition as it existed on September 19, 2015, the available treatments for it, the probable medical outcomes for each such treatment, or the detrimental effect, if any, of the alleged delay on those outcomes.[9] An average juror has no basis in common knowledge or ordinary experience to determine whether delays in treatment or other factors caused or exacerbated the injury about which Plaintiff complains. It would be entirely speculative for a jury to decide that a delay in transporting Plaintiff for medical care earlier would have resulted in a different result.

As with the requirement of showing the existence of a serious medical question, the sum of Plaintiff's evidence as to whether the alleged delay in transporting him for medical attention caused him any injury consists of statements allegedly made by Dr. Maddox, and Plaintiff's own opinions. Plaintiff testified that the day after he was admitted to Mission Hospital, testing was performed and Dr. Maddox informed him that he had blockages in his coronary arteries. (Doc. No. 24-1 at pp. 51-53, 107). Dr. Maddox advised him that he could perform heart surgery (described as "some kind of bypass"), or alternatively, have stents inserted. (Id. at p. 53). Plaintiff chose the stent procedure. (Id.). Indeed, Plaintiff testified that Dr. Maddox did not actually perform the stent placement procedure—another doctor did—but Plaintiff cannot remember this doctor's name. (Id.). Plaintiff testified that following the stent procedure, Dr. Maddox visited to check on him, and Plaintiff told Dr. Maddox that he was considering filing a lawsuit over the delay in treatment he had experienced. (Id. at p. 54). According to Plaintiff, he asked Dr. Maddox what he thought about his plans to sue, and Dr. Maddox responded that

---

[9] Defendants note that, despite complaining about the alleged 10½ hour delay on September 19, Plaintiff testified even after arriving at Mission Hospital the evening of September 19, he did not undergo testing or the stent procedure until the next day. (Doc. No. 24-1 at p. 51-52, 107).

"excessive delay has caused you severe heart damage." (Id. at pp. 54-55). The Complaint alleges that Plaintiff's "doctor reviewed the chart . . . and stated that due to the excessive delay in [plaintiff] being given proper medical treatment [plaintiff] now suffer[s] from a severe heart disease and this is a chronic condition." (Doc. No. 1 ¶ IV(8)). Without objective medical evidence, Plaintiff's testimony about what Dr. Maddox allegedly told him about the medical effect of the delay fails to sufficiently demonstrate causation. See Buchanan v. Kapur, No. 2:15 CV 5 CDP, 2017 WL 3978377, at *8 (E.D. Mo. Sept. 11, 2017) (where the plaintiff alleged that a delay in treating her heart attack symptoms adversely affected her condition, stating that "[Plaintiff's] failure to provide verifying medical evidence of an adverse effect of delayed diagnosis or treatment defeats the objective component of showing deliberate indifference").

The Court recognizes that the Fourth Circuit Court of Appeals has stated that, in certain circumstances, a deliberate indifference plaintiff does not need expert medical testimony to survive summary judgment. In Scinto v. Stansberry, 841 F.3d 219 (4th Cir. 2016), the Fourth Circuit held that expert testimony was not required in a deliberate indifference claim alleging that prison officials deprived the plaintiff—a diabetic—of insulin. The court found that expert testimony was not necessary to establish a deliberate indifference claim because the risk of diabetes and the failure to provide insulin to a diabetic would be apparent even to laypersons. Id. at 230. The facts in Scinto, however, are very different from the facts in this action. First, unlike this case, in Scinto, "lengthy prison medical records" for plaintiff were in evidence establishing a serious medical condition of a diabetes diagnosis that was "longstanding, pervasive, well-documented, [and] expressly noted by prison officials," including the defendant doctor. Id. at 229 (citation omitted). Moreover, the Scinto court noted several supporting decisions from other circuit courts pertaining to the precise factual circumstances present in that

15

case—prison officials depriving inmates diagnosed with diabetes of insulin—without requiring the submission of expert testimony. Id. at 230 (citing various cases for the proposition that "it is a '[w]ell-known' fact that diabetes is a 'common yet serious illness that can produce harmful consequences if left untreated for even a short period of time'"). Finally, in Scinto, the Fourth Circuit emphasized that a jury would be capable of understanding the risks of failing to provide insulin to a diabetic and of a medical doctor's denial of a "diabetic's known need for insulin" without the aid of expert testimony. Id.

By contrast to the facts in Scinto, there are no medical records in evidence in this case and no prior diagnosis. Moreover, this case involves far more sophisticated medical issues than those in Scinto which, without the aid of expert testimony, would result in pure conjecture by a jury as to numerous complex medical questions about which there is no competent medical evidence in the record and that are within the province of medical expert opinion. As Defendants note, for instance, these questions include Plaintiff's clinical medical condition on September 19, 2015, at the following times: (1) when Plaintiff alleges he first requested medical attention; (2) when inmate Goodson was transported instead of Plaintiff; (3) when Crane returned from transporting Goodson; (4) when Plaintiff was told he would have to wait for Officer Charlene West to arrive after her son's midget football game; and (5) when he was ultimately transported for medical attention. As Defendants note, the jury would be tasked with answering these questions without the aid of expert testimony. Moreover, in answering these questions, the jury would then be charged with the even more complex task of determining the various treatment options for Plaintiff's clinical condition at each of these times, along with the risks and likely prognosis associated with each. Most critically, the jury would be tasked with determining the likely medical outcome of the alleged delay in treatment and whether the delay

was detrimental to an outcome absent the delay—an issue that is squarely within the province of medical expert opinion, and for which Plaintiff has presented no objective medical evidence whatsoever. That is, although Plaintiff alleges that his heart is irrevocably damaged because of the delay, he has presented no objective medical evidence supporting this allegation. Additionally, as noted by Defendants, the only evidence in the record on summary judgment as to Plaintiff's current condition shows that he has not seen another cardiologist or communicated with Dr. Maddox since being treated by him in September 2015, and he currently takes only aspirin. See (Doc. No. 24-1 at pp. 58, 66-67).

The Court further finds that even if the failure to produce any competent medical evidence supporting his claim is overlooked, Plaintiff has still failed to forecast sufficient evidence to survive summary judgment. Plaintiff's allegations in his Complaint and his deposition testimony demonstrates that he believes he should have been transported for medical attention before Goodson—the inmate who fell and was transported for medical evaluation before Plaintiff. He testified in his deposition that he was obviously the more ill inmate, that he should have had priority over Goodson in being transported to the hospital, and that the medical staff at the jail should have been better trained to recognize heart attack symptoms. See (Doc. No. 24-1 at 95-96; 100-02; 113-14; 114-15). Even when viewed in the most favorable light to him, Plaintiff's evidence at best only supports a claim of negligence. Under Section 1983, this is not enough. Furthermore, in opposing summary judgment, Plaintiff has submitted only his sworn affidavit where he asserts, again, without any supporting medical evidence, that he suffered injury to his heart because of the delay in treatment. (Doc. No. 29 at 2 ("What the doctor told me was that if I had been promptly treated—aspirin/blood thinners, anti-blockers would have could have prevented the major damage done to my heart caused by unexcusable

17

delays in getting me to treatment.")). He has also submitted an affidavit of a former fellow inmate at the jail, who testified only that another inmate died in the jail at some point because of the jail's lack of medical attention. (Doc. No. 29-1). This evidence is not enough to raise a genuine issue of material dispute as to whether Defendants were deliberately indifferent to Plaintiff's serious medical needs. Therefore, the moving Defendants are entitled to summary judgment as to Plaintiff's deliberate indifference claim.

## IV. CONCLUSION

In sum, for the reasons stated herein, the Court grants the summary judgment motion by Defendants.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 25), is **GRANTED**, and this action is dismissed with prejudice.

2. The Clerk is respectfully instructed to terminate this action.

Signed: November 29, 2017

Frank D. Whitney
Chief United States District Judge